EPC

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| [SUPPRESSED], | ) | **1:14-cv-05355** |
| | ) | **Judge Ruben Castillo** |
| Plaintiff, | ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| v. | ) | JURY TRIAL DEMANDED |
| | ) | |
| [SUPPRESSED], | ) | **FILED UNDER SEAL** |
| | ) | **DO NOT PLACE ON PACER** |
| Defendant. | ) | **DO NOT PLACE IN PRESS BOX** |

## COMPLAINT

## FILED IN CAMERA AND UNDER SEAL

### Pursuant to 31 U.S.C. § 3730(b)(2)



FILED

JUL 1 4 2014

THOMAS G BRUTON
CLERK, U S DISTRICT COURT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES *ex rel.* CUSTOMS FRAUD INVESTIGATIONS, LLC, | ) ) ) | |
| | ) | Case No. _____ |
| Plaintiff-Relator, | ) | |
| | ) | JURY TRIAL DEMANDED |
| v. | ) | |
| | ) | **FILED UNDER SEAL** |
| MUELLER INDUSTRIES, INC. and | ) | **DO NOT PLACE ON PACER** |
| SOUTHLAND PIPE NIPPLES CO., INC., | ) | **DO NOT PLACE IN PRESS BOX** |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff Customs Fraud Investigations, LLC ("CFI"), by and through undersigned

counsel, hereby brings this action against Defendants Mueller Industries, Inc. ("Mueller

Industries") and Southland Pipe Nipples Company, Inc. ("Southland"), alleging as follows:

## NATURE OF ACTION

1.      Defendants have engaged and continue to engage in widespread fraud against the

United States in violation of the False Claims Act ("FCA") by evading certain customs duties

owed to the U.S. Government, including (1) antidumping duties on standard circular welded pipe

("CWP" or "standard pipe") imports from Mexico and (2) "marking duties" that automatically

become due when goods are imported for sale in the United States without a proper country-of-

origin marking.  In the process, Defendants have knowingly submitted and/or caused to be

submitted false information to the Government for purposes of concealing the amount of

customs duties owed.

2

2.      Standard pipe from Mexico has been subject to substantial antidumping duties since 1992.  However, "line pipe" that conforms to American Petroleum Institute ("API") Specification 5L and is of a type principally used in oil and gas pipelines is exempt from these CWP antidumping duties.

3.      Defendant Mueller Industries and its subsidiaries, including Southland (collectively referred to herein as "Mueller"), import steel pipe from Mexico and other countries that is used for plumbing and other flow control products.  For at least the past three years, Mueller has unlawfully evaded CWP antidumping duties on its Mexican pipe by using its wholly-owned Mexican subsidiary, Mueller Comercial de Mexico ("Mueller de Mexico"), to buy, thread, and cut pipe in Mexico, which Southland has then imported into the United States falsely labeled as "line pipe"

4.      Unlike legitimate line pipe, Mueller's pipes do not meet the API 5L standard, nor are they of a type used in oil and gas pipelines.  Rather, the physical characteristics of Mueller's pipes plainly show that they are intended for use in household plumbing or structural applications (and are actually sold as such at big box retail outlets, such as Lowe's), are properly considered standard pipe, and are thus subject to CWP antidumping duties.  The pipes do not bear API 5L standard couplings or the API monogram, are low-grade Grade A[1] pipe, and are short, narrow, and threaded on both ends (referred to herein as "SNTBE" pipe).

5.      Nevertheless, Mueller has falsely certified to the U.S Department of Commerce ("Commerce") that it is not importing standard pipe.  Instead, Mueller is entering its standard SNTBE pipe as line pipe in contravention of the law.  To this end, Mueller is falsifying customs

---

[1]    Pipes are graded in terms of their strength, with Grade A being of less strength than Grade B, Grade B being of less strength than Grade C, and so on.

documents by classifying its SNTBE pipe as API 5L line pipe, when it is not, and by certifying to the U.S. Customs and Border Protection Agency ("CBP") that no antidumping duties are owed. In other words, Mueller has made numerous and repeated false statements to the U.S. Government in order to avoid antidumping duties levied on standard pipe, in violation of the FCA.

6.     Mueller's misrepresentations, moreover, were knowing and intentional. Mueller has an API 5L license, has participated in litigation regarding the CWP antidumping order for many years, and Commerce has expressly held that even API 5L pipe is not exempted from antidumping duties if it is not "of a type used for oil and gas pipelines," which Mueller's SNTBE pipe plainly is not. The intentional nature of Mueller's evasion is further underscored by the timing of Mueller's purported decrease in standard pipe imports, occurring simultaneously with a spike in CWP antidumping duty rates specific to Mueller.

7.     Plaintiff brings this action to recover damages and civil penalties on behalf of the United States as a *qui tam* relator pursuant to the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

## PARTIES

8.     Relator Customs Fraud Investigations, LLC ("CFI") is a limited liability company organized and existing under the laws of the State of Maryland, with a principal place of business in Takoma Park, Maryland. CFI conducts confidential research and analysis related to potential customs fraud. The company's principals collectively have thirty (30) years of experience representing U.S. companies and industries in international trade matters before administrative agencies, courts, international tribunals, and Congress, and have provided direct support to senior officials at the U.S. International Trade Commission ("ITC") and Commerce.

9.     This Complaint is not based on a public disclosure as set forth in 31 U.S.C. § 3730(e). In any event, Relator brings this action as the original source of information

4

regarding Defendants' violations of the False Claim Act, given that CFI has direct and independent knowledge of the information on which the allegations contained herein are based and/or knowledge that is independent of and materially adds to any allegations or transactions that were publicly disclosed, and CFI has voluntarily provided the information on which this action is based to the Government before filing this action.

10.     Defendant Mueller Industries is a publicly traded (NYSE: MLI) global manufacturer of flow control products, headquartered in Memphis, Tennessee. Mueller Industries wholly owns its Mexican subsidiary, Mueller de Mexico, which buys pipe in Mexico from original manufacturers, such as Ternium, one of the largest steel producers in Mexico and Latin America. Mueller de Mexico then cuts and threads this pipe for purposes of producing Mueller's SNTBE pipe. Mueller Industries then uses an importer-of-record to import into the United States falsely labeled as line pipe, thereby fraudulently evading antidumping duties applicable to standard pipe.

11.     Defendant Southland is also a wholly-owned subsidiary of Mueller Industries. Southland often serves as the importer-of-record for Mueller de Mexico with respect to direct sales in the United States. Southland was formed in Texas, but as of June 30, 2014, had forfeited its right to transact business in that state according to the Texas Office of Comptroller. Southland maintains the same mailing address as Mueller Industries in Memphis, TN. While other entities related to Mueller Industries may also have acted as importer-of-record for imports covered by the allegations of this Complaint, Southland is the only such entity that CFI has been able to specifically identify to date.

12.     The United States is named herein as a Plaintiff as the real party in interest pursuant to the False Claims Act, 31 U.S.C. §3729, *et seq*.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. §§ 3730(b), 3732.

14.     This Court has general and specific personal jurisdiction over Defendants by virtue of Defendants regularly transacting business in the State of Illinois.

15.     Venue is proper in this district pursuant to 31 U.S.C § 3732 because Mueller Industries regularly transacts business within this District.

## FACTS

16.     Paragraphs 1 through 15 are incorporated herein by reference.

### Antidumping Duties on Mueller Standard Pipe

17.     Antidumping duties are intended to remedy the sale of foreign imports for less than their normal value, a practice referred to as "dumping" that is widely considered to have distortive effects on international trade.  Antidumping duties provide relief to U.S. industry from this unfair trade practice.

18.     In 1992, the United States issued an antidumping order on "standard pipe" from Mexico, which remains in place today.  Standard pipe or Circular Welded Pipe ("CWP") are industry terms for general purpose or uncategorized non-alloy steel pipe—just plain steel pipe. According to the "scope" of the CWP antidumping order, which defines what products the order covers, standard pipes often "are intended for the low pressure conveyance of water, steam, natural gas, and other liquids and gases in plumbing and heating systems, air conditioning units, automatic sprinkler systems, and other related uses."  In other words, it is pipe commonly used for residential plumbing.

6

19. The exact antidumping duty rate on Mueller's standard pipe imports has varied depending on the year of importation. Prior to 2009, Mueller imported standard pipe from original Mexican manufacturers Hylsa S.A. de C.V. ("Hylsa") and Tuberia Nacional (known as "TUNA"). Under Commerce's 2003 re-seller policy, Mueller was thus able to benefit from the low duty rates secured by those manufacturers of 10.38% and 1.92% respectively. By comparison, during this same time period, an antidumping duty rate of 32.62% applied to all other CWP manufacturers.

20. In or about 2009, however, Mueller devised a scheme to fraudulently import its standard pipe as line pipe in order to avoid a sharp, retroactive increase in CWP antidumping duties assessed against Mueller. Commerce determined in 2009 that Ternium, one of the largest steel producers in Mexico and Latin America, had acquired Hylsa and thus was its successor in interest for antidumping purposes. Accordingly, the low Hylsa antidumping duty rate was no longer available. This meant that the default "all others" rate of 32.62% would apply to all imported Ternium pipe unless Mueller and/or Ternium were able to obtain a lower rate by seeking an administrative review from Commerce.

21. Commerce's administrative review, however, resulted in a steep increase in antidumping duty rates for Mueller and Ternium. For the period covering November 1, 2007 through October 31, 2008, for example, Commerce assigned both Mueller and Ternium antidumping duty rates of 48.33%, even higher than the "all others" rate of 32.62% that would have applied had Mueller and Ternium not requested an administrative review. Mueller tried again the next year, but only got its rate down to 19.81%—still much higher than its previous rates—for the period covering November 1, 2008 through October 31, 2009.

22.     Although Mueller imported approximately $14 million worth of standard pipe from November 2007 to October 2009, Mueller has certified to Commerce that it has had **zero** standard pipe imports since October 31, 2009, leading Commerce to rescind later administrative reviews of Mueller's imports.

23.     Yet Mueller's certifications were, in fact, false as Mueller continues to import standard pipe. To avoid CWP antidumping duties on this pipe, Mueller falsely claims that it is "line pipe," which, if true, would fall within an exemption to Commerce's CWP antidumping order. Mueller's purported "line pipe," however, is merely standard pipe that falls within the plain language and purpose of the CWP antidumping order and on which Mueller should be paying antidumping duties.

24.     In sum, when Ternium acquired Hylsa, Ternium/Hylsa pipe became very expensive to import. Mueller responded by trying to get the lowest possible antidumping margin for itself. But Mueller also had a strong incentive to find another way to avoid the steep antidumping duties on its standard pipe. One way to do that was to buy line pipe, normally a more expensive, higher-quality product sold to the gas and petroleum industry, and then sell it for standard pipe applications, such as plumbing.

### Mueller's Pipe is Not Line Pipe

25.     According to industry understanding and as reflected in the CWP antidumping order, line pipe conveys gas at high pressures in pipelines such as oil well gathering systems and utility gas mains, whereas standard pipe is used, for lower pressure plumbing, heating, or other applications for single customers, typically in a shorter and less linear system leading to or within a building. Utilities, for example, will use standard pipe for local gas distribution lines where pressures are so low that they do not need line pipe. Standard pipe is also used for light structural and mechanical applications like fence tubing, and other uses not requiring special qualities.

8

26.     Steel pipe that is made, imported, or sold in the United States is usually made in accordance with various industry standards established by independent standard-setting organizations such as the API. Among the standards set by API is specification 5L, entitled "Specification for Line Pipe: Petroleum and natural gas industries—Steel pipe for pipeline transportation systems." Most U.S. line pipe is made to this specification, which sets standards for "pipe suitable for use in conveying gas, water, and oil in both the oil and natural gas industries." The API 5L Specification includes required manufacturing methods, materials, mechanical properties, end type, coupling, testing and inspection, marking and traceability features, tolerances, and other qualities.

27.     Only pipe that meets the industry API 5L standards *and* is of a type used for oil and gas pipelines is considered line pipe falling within the exemption to the CWP antidumping order. Mueller's SNTBE pipe meets neither of these criteria, lacks many of the other physical characteristics typical of line pipe, and, in fact, is marketed and sold by Mueller in home improvement stores, such as Lowe's, for ordinary standard pipe uses, not as line pipe. The physical characteristics of Mueller's pipe—including its noncompliance with API 5L standards and the channels of trade in which it is sold—thus overwhelmingly demonstrate that Mueller's SNTBE pipe is subject to CWP antidumping duties, which Mueller has been unlawfully evading.

28.     Of particular relevance, the API 5L Specification for line pipe clearly requires that one end of threaded line pipe must have a specialized line pipe coupling attached, along with a threading compound to create a tight seal, providing: "[o]ne end of each length of threaded pipe shall be provided with a coupling conforming to the requirements of Annex F and the other end shall be provided with thread protection conforming to the requirements of 12.2." Consequently, although line pipe is typically made with plain ends that are welded together (and

9

which are thus not required to have couplings), the current API 5L Specification allows for smaller sizes of the lower standard of welded line pipe to be threaded provided that specialized line pipe couplings of the same grade as the pipe are attached by the manufacturer, which Mueller's pipe lacks.

29. A line pipe coupling is a threaded link designed to connect two lengths of threaded line pipe. Unlike many other API 5L provisions, the coupling requirement is a long-standing and widely applied requirement of line pipe and cannot be varied by agreement between buyer and seller. The API 5L line pipe coupling requirement serves several purposes, the most important of which is safety and accountability. Having a single manufacturer responsible for attaching the pipe and couplings, for example, ensures that the correct type of coupling will be used as the pipe passes through the chain of commerce, thereby reducing the risk of leaks and explosions. Because Mueller's SNTBE pipe does not have the proper coupling attached, it is much more likely that through inadvertence, neglect, lack of availability, or as a cost-saving measure, a subsequent user would employ an inappropriate coupling or other fitting.

30. If Mueller's SNTBE pipe came with the required line pipe coupling and thereby complied with the API 5L Specification, the pipe would likely be priced out of the standard pipe market. Mueller is thus end running the line pipe specification in order to continue to dump its Mexican standard pipe in violation of the CWP antidumping order. Indeed, Mueller undertakes the trouble and expense of purchasing, cutting, and threading Ternium pipe only because it is more cost-effective than paying antidumping duties. Given the expense of specialized line pipe couplings and the fact that Mueller's intended purchasers do not need a line pipe coupling, Mueller saves significant money by importing its SNTBE pipe without the required line pipe couplings, which likely account for 10% to 15% of the value of short pipe lengths. However,

because Mueller's imported SNTBE pipes lack any couplings, they do not meet the current API 5L Specification for line pipe. Based on this fact alone, Mueller's SNTBE pipe is <u>not</u> exempted from the CWP order.

31. Moreover, not only does Mueller's pipe not meet API Specification 5L due to the lack of a coupling, Mueller's SNTBE pipe also lacks many of the other physical characteristics normally associated with U.S. line pipe. Commerce has recently stated, for example, that SNTBE pipes, like Mueller's, are not likely to be used for oil and gas pipelines, reasoning that dual-certified line/standard pipe is normally used only for standard pipe applications if it is (1) 32 feet or less in length, (2) less than 2 inches in outside diameter, (3) painted or galvanized, or (4) has threaded and/or coupled ends. Mueller's SNTBE pipe has all of these characteristics, plus it lacks an API logo and specialized API coupling. Mueller's SNTBE pipe thus cannot lawfully be classified as line pipe exempted from the CWP antidumping order.

32. First, Mueller's SNTBE pipe is much shorter in length than typical line pipe, which is intended for use in oil and gas pipelines and thus are longer with larger diameters for more efficient, long-distance pipeline transmission. Most line pipe is produced in "double random lengths" of 40-45 feet, while single random length (20 feet) and triple random length (60 feet) pipe "comprise only a small part of the market." Joints are expensive and create a risk of leaks. Thus, for a pipeline covering any real distance, such as oil and gas pipelines, it is preferable to use fewer, longer pipes so as to minimize the number of connections to be made during field installation. Short pipes, by contrast, are more useful inside plumbing and heating systems involving short distances. Indeed, the current API 5L line pipe specifications only provide a length tolerance of less than 10 feet in one instance. Mueller's SNTBE pipe, by contrast, range from one to ten feet long, nowhere close to the average single random length line

11

pipe, the shortest line pipe available. Pipes of this length would only be used rarely, if at all, as end pipe "pup joints" and, when small in diameter, are typically cut in the field or at a local machine shop (not imported in mass quantities as Mueller's are). By contrast, small diameter short lengths of pipe are ubiquitous in residential plumbing systems.

33.     Mueller's SNTBE pipes are also small in diameter. Pipelines serving multiple customers need larger diameters to carry sufficient volume. Large diameters are also better suited to longer distance pipeline transport because they offer proportionately less resistance to flow. By contrast, individual home and business plumbing and heating pipes are typically less than 1 ½ inches in diameter. Mueller's SNTBE pipes range from ½ inch to 1 and ¼ inch in diameter. These small diameters thus support a finding that Mueller's SNTBE pipe is standard pipe covered by the AD order.

34.     Additionally, Mueller's pipe is Grade A pipe, which is low-grade, cheaper, and rarely used in line pipe applications. Given the volume of material and pressure required to be transported via oil and gas pipelines, light, strong, high-grade pipe is needed. To accommodate this volume and pressure, Grade A pipe would require such thick walls and thus be so heavy as to make its use impractical. Line pipe is therefore typically X-42 grade or higher. For example, reportedly less than 2% of welded line pipe sold in 1998-1999 was Grade A, which underscores just how rare the breed of SNTBE pipe that Mueller imports is.

35.     In addition, unlike most line pipe, Mueller's pipes are threaded at both ends. The large majority of line pipe, by contrast, is sold with plain or beveled ends that are spot welded together upon installation to create a strong, leak-proof, and durable seal. This is particularly important when conveying oil or gas over a long distance, particularly underground, and reduces the risk of leaks and explosions. Threaded pipes, by contrast, are useful if a pipe may be moved or is being installed by a plumber or contractor with no welding capability.

36.     The lack of a specialized line-pipe coupling further confirms that Mueller's SNTBE pipe likely will be fitted with conventional fittings for plumbing applications and is not intended or destined for use in oil or gas pipelines. Rather, the pipe is intended for use by building contractors and plumbers in residential, business, or office plumbing/heating systems, or other non-pipeline use, for which standard pipe would normally be used.

37.     Finally, none of Mueller's pipes bear the API monogram (a diamond containing the stylized letters API and the letter Q beneath). The monogram warrants not only that the product meets a particular API specification, but also that the manufacturer has been audited by API and that API has verified its quality management system. API encourages customers on its website to report any problems with API monogrammed products, and can sanction licensees who fail to meet standards. Thus, an API monogram helps guarantee compliance with an API standard. The quality assurance API monogram, however, is only useful to utilities and pipeline operators that need the pipe for its specialized performance line pipe applications. The lack of an API monogram on Mueller's pipe thus highly suggests that Mueller knows its pipe does not meet the API 5L specification and/or knows that its customers do not care. Indeed, builders and plumbers who want only standard pipe may not even be aware of the API monogram program.

38.     In sum, given the physical characteristics of Mueller's SNTBE pipe, it is overwhelmingly a standard pipe manufactured for low pressure applications such as for household or business plumbing or heating systems, and would be highly unlikely to ever be used in an oil or gas pipeline. End users would not expect Mueller's SNTBE pipe to be used as line pipe, nor do they use it as line pipe. Thus, Mueller's SNTBE pipe is plainly standard pipe subject to CWP antidumping duties and the only reason for Mueller to categorize this pipe as line pipe is to unlawfully avoid paying such duties.

39.     Indeed, Mueller's pipes are not being marketed or sold as line pipe.  Mueller is selling its SNTBE pipe in a channel of distribution—big box home improvement retailers such as Lowe's—that is typical of standard pipe, not of line pipe.  There is little if any petroleum and gas industry activity in the Washington, D.C. suburbs, and even if there was, oil and gas companies do not purchase line pipe from Lowe's.  Rather, Mueller's SNTBE pipe is being marketed for ordinary construction uses.  Mueller's labels simply state "steel pipe."  In addition, the fact that some of Mueller's pipe is dual stenciled alerts buyers to the availability for non-line-pipe use.  When combined with the other physical characteristics of Mueller's SNTBE pipe discussed above, Mueller clearly intends its SNTBE pipe to be used, and knows that it is in fact being used, as standard pipe, not as line pipe.

### Mueller's False Statements Made to Evade Antidumping Duties

40.     Mueller is thus intentionally manufacturing its SNTBE pipe imported from Mexico for standard pipe applications, notwithstanding that it falsely labels this pipe as API Specification 5L line pipe.  Mueller would not be engaging in this charade if not to fraudulently avoid antidumping duties.

41.     Once an antidumping order is in place, the importers of any products subject to the order are required to declare and deposit with CBP the applicable duty.  Notwithstanding that Mueller's SNTBE pipe cannot lawfully be classified as line pipe, Mueller is falsely classifying it as such for customs purposes and falsely declaring estimated duty rates in its customs entry documents accordingly.

42.     On or about the time of importation, an importer is required to file certain "entry documents" with CBP, which among other things, must enable CBP to "properly assess duties on

the merchandise" and "determine whether any other applicable requirement of law . . . is met." 19 U.S.C. § 1484(a)(1)(B).

43.     Such entry documents, for example, typically include an entry summary, such as CBP Form 7501 or its electronic equivalent, which requires an importer to describe, *inter alia*, the country of origin, the value of the merchandise, the tariff classification, and the importer's estimate of the correct amount of duties, fees, and other charges and exactions. Blocks 29 and 33 specifically require an importer to fill in information relating to the proper HTS classification and AD/CVD duties owed, while Block 29 requires an importer to record the "total estimated AD/CVD or other fees, charges or exactions paid."

44.     In addition to filing entry documents, importers must also deposit estimated duties, fees, charges, and exactions owed with CBP on or about the time of importation. 19 U.S.C. § 1505(a), 19 C.F.R. § 141.103.

45.     Given that Mueller certifies that it has not imported standard pipe, Mueller must have knowingly misclassified its SNTBE pipe as line pipe in these customs entry forms and intentionally misrepresented that it owed no antidumping duties on this pipe.

46.     Since in or about 2009, Mueller has also repeatedly falsely certified to Commerce that it is not importing standard pipe subject to the CWP antidumping order. Specifically, on or about February 25, 2011, for example, Defendants submitted and/or caused to be submitted a false "no shipments" claim to Commerce, namely that Southland and Mueller de Mexico had not exported or imported any standard pipe subject to the CWP antidumping order for the time period covering November 1, 2009 through October 31, 2010. Defendants further submitted or caused to be submitted documentation in support of these false claims to Commerce on or about February 25, 2011 and March 11, 2011. Thereafter, on or about July 19, 2011, Defendants

submitted and/or caused to be submitted a similar false claim that Southland had neither

produced nor exported any such shipments. As yet another example, on or about April 9, 2013,

Defendants submitted and/or caused to be submitted similar false statements in a "no shipments"

letter claiming Mueller de Mexico had not imported standard pipe subject to the CWP

antidumping order during the time period November 1, 2010 through October 31, 2011.

47.     The falsity of these "no shipments" certifications went undetected by Commerce

despite Commerce and CBP's attempts to verify these claims because Mueller falsely classifies

its SNTBE pipe under the tariff code for line pipe.

48.     The U.S. Customs entry category for line pipe, HTS 7306.10 (presently

renumbered as 7306.19), applies to circular steel non-alloy pipe "of a type used for oil and gas

pipelines." Even API 5L certified line pipe is only properly classified under HTS 7306.10 (not

7306.19) if its physical characteristics support an industry classification of the pipe as that which

is "used for oil and gas pipelines."

49.     Mueller is classifying its SNTBE pipe as line pipe under HTS 7306.10 (now

7306.19). Yet, this classification is fraudulent because Mueller's SNTBE pipe does not comply

with the API 5L industry specifications for line pipe, its physical characteristics confirm that it is

not line pipe, and Mueller is, in fact, marketing and selling its SNTBE pipe for standard pipe

applications. Mueller is thus knowingly misclassifying its SNTBE pipe to avoid paying

antidumping duties on the same.

50.     In sum, since at least 2009, Mueller has purchased low-grade Grade A line pipe in

Mexico from Hylsa and its successor Ternium, cut it to shorter lengths, and added threads on

both ends. Mueller has then imported this pipe into the United States, falsely certified it as

complying with the API 5L Specification for line pipe and API 5B thread specifications, falsely

classified it as line pipe in customs entry documents, fraudulently failed to record or deposit antidumping duties owed, and falsely certified to Commerce that it has no standard pipe imports. Mueller did this with knowledge or reckless disregard for the fact that its SNTBE imports are plainly subject to the CWP antidumping order because the pipe does not meet the requirements of API 5L and, in any event, is obviously not of a type used for oil and gas pipelines.

51.     Consequently, Defendants routinely made or used, or caused to be made or used, false and fraudulent records and statements material to Mueller's obligation to pay marking duties to the U.S. Government, an obligation that Defendants further knowingly concealed and knowingly and improperly avoided or decreased, in violation of the FCA, 42 U.S.C. § 3729(a)(1)(G).

52.     Defendants have thus regularly and systematically violated the FCA. Defendants further did so "knowingly" as defined in § 3729(b) of the Act.

53.     As a sophisticated and long-standing member of the pipe industry, Mueller knows that the pipe it imports as and claims to be "line pipe" is, in fact, standard pipe subject to the CWP antidumping order. Commerce has held that "pipe otherwise meeting the line pipe specification, but not of a type used for oil or gas pipelines, is not included in the exemption," and that "such pipe would not be classified under HTS 7306.10.10." Here, not only is Mueller's SNTBE pipe not of this type, it doesn't even meet the API 5L standard.

54.     Moreover, Mueller has an API 5L license and has actively litigated antidumping reviews under this order, so the company is intimately familiar both with the specification and the language of the CWP antidumping order. Because line pipe enters the United States duty free, Mexican pipe manufacturers like Mueller have a strong incentive to declare their pipe to be line pipe, accurately or not.

55. Indeed, Mueller is importing its galvanized pipe (which CPB has specifically held cannot be used as petroleum line pipe and thus does not qualify for HTS 7306.10 even if API 5L certified) from countries not subject to the CWP antidumping order, such as Guatemala and South Africa. And although line pipe imports from Mexico under HTS 7306.19.10 (line pipe of oil or gas variety, iron or non-alloy steel, seamed, OD under 406.4 mm) were valued at $122 million in 2010, $161 million in 2011, and $125 million in 2012, almost no pipe is imported from Guatemala in this category, with most pipe being imported under the standard pipe tariff classification HTS 7306.30.50.32 (other CWP nonalloy galvanized not over 114.3 mm diameter). This stark contrast underscores that Mueller is intentionally claiming its pipe is API 5L line pipe in order to avoid the steep increase in the duties on its standard pipe.

56. Because Mueller's SNTBE pipe is not intended to be marketed as line pipe, the only reason for Mueller falsely classifying its SNTBE pipe as line pipe would be to mislead CBP and evade antidumping duties. Mueller would not have gone to the trouble and expense of purchasing, cutting, and threading Ternium pipe had it not been more cost-effective than paying antidumping duties. Mueller's evasion of these duties, however, if unlawful.

**Mueller's Unlawful Evasion of Country-of-Origin Duties**

57. In addition, in violation of U.S. law, Mueller is knowingly importing pipe from Mexico and other countries without proper country-of-origin markings, which automatically imposes an obligation on Mueller to pay certain customs duties, namely, what are referred to as "marking duties" in the amount of 10% of the value of the unmarked imports.

58. At all times material to this Complaint, Section 304 of the U.S. Tariff Act of 1930 (the "Tariff Act"), 19 U.S.C. § 1304(a), has required imported iron and steel pipe and pipe fittings to be "marked in a conspicuous place as legibly, indelibly, and permanently as the nature

18

of the article (or container) will permit in such manner as to indicate to an ultimate purchaser in the United States the English name of the country of origin of the article."

59.     The Tariff Act, 19 U.S.C. § 1304(c), further specifically requires that the country of origin of such pipe and pipe fittings must be marked in one of five ways: die stamping, cast-in-mold lettering, etching, engraving, or continuous paint stencil, or, if all of these methods are "technically or commercially infeasible," the pipe and pipe fittings may be marked by "an equally permanent method of marking." Unlike other products, no exception can be made to the country-of-origin marking requirements for imported iron and steel pipe and fittings. Consequently, marking containers in which pipe fittings are imported does not satisfy Tariff Act requirements.

60.     Under the Tariff Act, 19 U.S.C. § 1304(i), goods that are not properly marked with their country-of-origin are subject to a special category of customs duties, referred to as "marking duties," which are assessed at "10 per centum ad valorem" and "shall be deemed to have accrued at the time of importation, shall not be construed to be penal, and shall not be remitted wholly or in part nor shall payment thereof be avoidable for any cause." An importer is personally liable for these duties.

61.     Mueller knowingly and intentionally disregards country of origin marking requirements, in plain violation of black letter law. Few of Mueller's pipes are stenciled, engraved, or otherwise permanently and properly marked with their country of origin. Rather, at the point of sale, these pipes have only small paper labels identifying them as foreign made, which are not permanently attached to the product, in violation of U.S. customs law.

62.     Indeed, many of Mueller's pipes, including those imported from Mexico, China, and the United Arab Emirates, have no original country of origin markings whatsoever (i.e.

markings applied by the original manufacturer directly on the pipe). Others bear stenciled country of origins, but are not painted continuously as required by U.S. law. Instead, the stenciling is cut off at arbitrary points, with the country of origin appearing at most once on the pipe. Still others were originally engraved with their country of origin (which is proper even if done only once per pipe). But because Mueller cuts its pipes to length without any regard to preserving their country of origin markings, many of Defendants' pipes are being sold without proper country of origin identifications.

63.    Because Mueller's pipes are not properly marked with their countries of origin at the time of importation, Mueller was liable for an additional 10% marking duty with respect to its improperly marked pipe imports. Mueller knowingly failed to pay these marking duties. Mueller further knowingly falsified customs documents required to be filed with the Government and otherwise concealed the company's obligation to pay those marking duties by making false statements on its entry documents.

64.    CBP is charged with monitoring and enforcing U.S. trade laws and customs regulations regarding the importation of foreign goods. CBP collects customs duties, including marking duties, and, under certain circumstances, can require unmarked or mismarked goods, if detected, to be properly marked, destroyed, or re-exported. Mueller is able to successfully (albeit unlawfully) import its unmarked and improperly marked pipe into the United States by knowingly failing to pay or disclose to CBP the marking duties the company owes. Mueller commits this fraud on the U.S. Government by, among other things, falsifying its entry documents such that CBP will not detect the company's fraud.

65.    With respect to marking duties, for example, Form 7501 specifically requires importers to record "any other fee, charge or exaction that applies" and any "estimated duty . . .

and any other fees or charges" owed to the Government.  In addition, Mueller must also deposit

estimated marking duties owed with CBP on or about the time of importation.  19 U.S.C.

§ 1505(a), 19 C.F.R. § 141.103.  Although the amount of duties deposited represents only the

importer's estimate of how much money it owes, because entries often automatically "liquidate"

by statute at the duty rate estimated by the importer, any false information or omissions in entry

documents will directly cause duties not to be paid.  *See* 19 U.S.C. § 1504(a); 19 C.F.R.

§ 159.11.

66.    Consequently, Defendants routinely made or used, or caused to be made or used,

false and fraudulent records and statements material to Mueller's obligation to pay marking

duties to the U.S. Government, an obligation that Mueller further knowingly concealed and

knowingly and improperly avoided or decreased, in violation of the FCA, 42 U.S.C.

§ 3729(a)(1)(G).

67.    Defendants have thus regularly and systematically violated the FCA.  Defendant

further did so "knowingly" as defined in § 3729(b) of the Act.

## COUNT ONE: 31 U.S.C. § 3729(a)(1)(G)

68.    Paragraphs 1 through  67 are incorporated herein.

69.    Defendants knowingly made, used or caused to be made or used, false records and

statements material to an obligation to pay or transmit money or property to the U.S.

Government.

70.    These false records and statements included, but may not be limited to, entry

documents and representations therein filed by Mueller or its agents on or about the time of

importation and the posting of duties owed with respect to Mueller's SNTBE pipe imported from

Mexico, as well as those Mueller pipes imported from Mexico and other countries that are not

properly marked with their foreign countries of origin.

21

71.     Defendants knowingly concealed an obligation to pay or transmit money or property to the U.S. Government by, *inter alia*, failing to pay CWP antidumping duties and marking duties that they owed and submitting false records or statements in connection with the same.

72.     Defendants knowingly and improperly avoided or decreased an obligation to transmit money or property to the U.S. Government by, *inter alia*, failing to pay the CWP antidumping duties and marking duties they owed and submitting false records or statements in connection with the same.

73.     As a result of Defendants' conduct, including these false records or statements, the U.S. Government suffered damages, including the amount of CWP antidumping duties and marking duties that Defendants owe but have not paid.

## PRAYER

WHEREFORE, Plaintiff prays for the following relief:

1.     A permanent injunction requiring Defendants to cease and desist from violating the False Claims Act;

2.     Judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained as a result of Defendants' unlawful conduct;

3.     Civil monetary penalties for each false record or statement made, used, or caused to be made or used by Defendants that was material to any obligation to pay or transmit money or property to the U.S. Government and/or for each instance of Defendants knowingly concealing or knowingly and improperly avoiding or decreasing any obligation to pay or transmit money or property to the U.S. Government;

4.     An award to Relator pursuant to 31 U.S.C. § 3730(d);

5.    An award of reasonable attorneys' fees, costs and expenses;

6.    Such other relief as the Court deems just and equitable.

## JURY DEMAND

Relator Customs Fraud Investigations, LLC hereby demands a jury trial on all issues so triable.


Dated:  July 14, 2014                          Respectfully submitted,

                                               CUSTOMS FRAUD INVESTIGATIONS, LLC

                                               By _____

                                               David J. Chizewer
                                               William C. Meyers
                                               Matthew K. Organ
                                               GOLDBERG KOHN LTD.
                                               55 East Monroe Street
                                               Suite 3300
                                               Chicago, Illinois  60603
                                               (312) 201-4000

                                               Jonathan K. Tycko
                                               Anna C. Haac
                                               TYCKO & ZAVAREEI LLP
                                               2000 L Street, N.W.
                                               Suite 808
                                               Washington, D.C. 20036
                                               (202) 973-0900

                                               *Counsel for Relator Customs Fraud Investigations,*
                                               *LLC*